793 A.2d 471 (2002)
In re W.E.T. and I.J.T.
D.B., Appellant.
In re W.E.T. and I.J.T., Appellants.
Nos. 99-FS-1271, 99-FS-1380.
District of Columbia Court of Appeals.
Argued September 25, 2001.
Decided March 14, 2002.
*472 John J. Connelly, Washington, DC, appointed by the court, for D.B. (mother).
Lewis Franke, appointed by the court, for W.E.T. and I.J.T. (adoptive parents).
Karen H. Mitchell, Washington, DC, guardian ad litem, filed a statement in lieu of brief for K.D.B. (child).
Carol Ann Dalton, Washington, DC, filed a statement in lieu of brief for L.M. (father).
Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for the District of Columbia.
Before WAGNER, Chief Judge, and TERRY and GLICKMAN, Associate Judges.
Terry, Associate Judge:
In this adoption case, D.B., the natural mother of the child K.D.B., seeks reversal of the trial court's order waiving her consent to the adoption. See D.C.Code § 16-304(e) (2001). The adoptive parents, W.E.T. and I.J.T., cross-appeal from the trial court's order vacating and re-entering the final adoption decree to enable D.B. to file her notice of appeal, which would otherwise have been untimely. We affirm both orders.

I
The Department of Human Services ("DHS") removed K.D.B. from D.B.'s care when D.B. was arrested for panhandling while K.D.B. was with her. K.D.B. was born in April 1992; at the time of his mother's arrest in August 1993, he was sixteen months old. After D.B.'s arrest, DHS placed K.D.B. at St. Ann's Infant Home. Thereafter St. Ann's contacted I.J.T., D.B.'s aunt (K.D.B.'s great-aunt), and asked her if she would take care of K.D.B. I.J.T. agreed to do so and, together with her husband, W.E.T., has cared for K.D.B. in her home since January 1994.[1]
During the pendency of the neglect case that arose out of D.B.'s failure to care for her child, D.B. did not attend some of the hearings because of an outstanding warrant for her arrest. Later, D.B. entered into a "service agreement" with her social worker in which she agreed to work toward completing her high school diploma, to participate in mental health therapy and physical therapy, and to undergo drug treatment. However, at the time of the hearing below, D.B. had only partially complied with the terms of the agreement. She was still working on her high school diploma, but she had participated in mental health therapy only until her therapist retired, and had not begun any physical therapy. When asked whether she had "also agreed to participate in drug rehabilitation," she answered, "I don't recall that." Although D.B. did seek drug treatment at the House of Ruth, a private social service agency for women and children, she was removed from the program (according to her testimony) because of her "attitude" after she became involved in a dispute with a staff member.
During the hearing, D.B. admitted that she had had a long history of drug abuse since she was a teenager. PCP was her drug of choice, but she also used crack *473 cocaine. D.B. also had a history of criminal conduct. In addition to her panhandling arrest, she had been arrested on other occasions for disorderly conduct and grand larceny. At the time of the hearing, she was serving a sentence of two and a half years in Virginia for the latter offense. The evidence also showed that D.B. had maintained a transient lifestyle from time to time in the past. She had lived in her mother's home until her mother's death; thereafter she had sometimes resided either on the street or in a shelter. At the hearing D.B. testified that she had an apartment on L Street, S.W., even though she was incarcerated, and that her grandmother was paying the rent for that apartment.
At the time of the hearing, D.B. had not visited K.D.B. for more than two years. Before that, a court order had authorized her to visit K.D.B. at the home of W.E.T. and I.J.T. on alternate Sunday afternoons. D.B. came to see K.D.B. at these appointed times for a few months, but then her visits became irregular, and around the middle of 1996 they stopped altogether.
When K.D.B. first came to live with W.E.T. and I.J.T., he was small for his age, suffering from asthma, and not verbalizing at a level commensurate with his years. At the hearing, however, I.J.T. testified that he was now an energetic, healthy six-year-old who addressed her and her husband W.E.T. as "Mommy" and "Daddy." According to the evidence, he has performed well in school ("he is above average in all of [his] academic activities") and is involved in a variety of family activities with them, including reading, gardening, and participating in the children's choir at their church. K.D.B. learned to read in kindergarten and has started to read to his younger brother, K.B.[2] He has also learned to use a computer, and I.J.T. and W.E.T. have obtained "[computer] programs to help him enhance his school activity." I.J.T. said that she and her husband intend to "provide him with a stable home [and] a good education. We certainly have plans that he would go on to college."
In February 1998 W.E.T. and I.J.T. filed a petition to adopt K.D.B. D.B. opposed the petition. On August 22, 1998, after a two-day hearing, the trial court issued a detailed "Memorandum of Findings of Fact, Conclusions of Law and Order" in which, among other things, the court waived the consent of D.B. to the adoption.[3] An attachment to the order stated that copies had been mailed to various interested parties, specifically including "counsel for the mother" by name. On October 2, 1998, a Final Decree of Adoption was filed, and on October 6 it was entered on the docket.
On September 7, 1999, nearly one year later, D.B. moved to set aside the Final Decree and to reissue it in order to permit a timely appeal. As grounds for the motion, counsel for D.B. claimed that he had never received notice of the decree.[4] The *474 trial court granted the motion in an order filed September 15, citing as reasons both counsel's representation that he had received no notice of the Final Decree and the fact that the motion was filed within one year of the decree, so that the decree could therefore "be vacated for good cause." A "Reissued Final Decree of Adoption" was filed and entered on the docket the same day.
D.B. filed a timely notice of appeal from the reissued Final Decree.[5] W.E.T. and I.J.T. noted a timely cross-appeal from the order granting D.B.'s motion to set aside the original Final Decree.

II

A. The Duty of Counsel

At oral argument, D.B.'s counsel admitted that he became aware of the entry of the final adoption decree through a chance encounter with counsel for W.E.T. and I.J.T. in a courthouse hallway in early 1999. The motion to set aside the decree, however, was not filed until September of that year, several months later. We are concerned about counsel's failure to review the docket regularly and to respond with alacrity, as necessary, to new events reflected on that docket. The delay of several months between the moment when counsel became aware of the final decree and the time when he took action is also troubling.[6] In an adoption case, when the best interests of the child and the rights of both the natural and the adoptive parents are at stake, counsel's duty of diligence should be paramount in his mind.
The duty of an attorney to keep apprised of docket entries is well established.
In the practice of law, a lawyer is charged with the responsibility of knowing what is entered upon the dockets, from time to time, in the case in which he is counsel. It is his duty to follow the dockets so as to keep himself abreast of the happenings in his case. . . .
Maryland Metals, Inc. v. Harbaugh, 33 Md.App. 570, 575-576, 365 A.2d 600, 603 (1976); accord, e.g., Pumphrey v. Grapes, 215 Md. 573, 576, 138 A.2d 916, 918 (1958) ("The obligation to follow and consult the docket rests upon counsel, who are charged with notice"); Baltimore Luggage Co. v. Ligon, 208 Md. 406, 421-422, 118 A.2d 665, 673 (1955) ("It is settled that a party to litigation, over whom the court has obtained jurisdiction, is charged with the duty of keeping aware of what actually occurs in the case and is affected with notice of all subsequent proceedings and that his actual knowledge is immaterial"); see also Pryor v. Pryor, 343 A.2d 321, 323 (D.C.1975) (rejecting claim of excusable neglect based on "lack of knowledge of the entry of judgment occasioned by failure to receive the clerk's notice"). Likewise, the duties of competence, diligence, and communication are fundamental to the practice of law. See D.C. Rules of Professional Conduct, Rules 1.1, 1.3, and 1.4.
While counsel in this case could reasonably relyto some extenton the requirement in Adoption Rule 52(b) that the clerk "shall serve on all contesting parties" notice of the granting of a petition for adoption, his failure to receive such notice within a reasonable time after the hearing *475 should have focused counsel's attention more directly on its absence. The judge said at the end of the hearing that a final decree would be entered "within the next month or two." When that time passed without any notice from the court, counsel should at least have made some inquiry into the reasons for the delay. Indeed, the nagging question in his mind that prompted counsel to ask his opponent about the adoption decree in the courthouse hallway should have driven him much earlier to the clerk's office to seek an answer to that question. Similarly, the long delay in filing the motion to set aside the decree could have been avoided by counsel's visiting D.B. wherever she was incarcerated, or at least writing her a letter if she was far away, so that he could have found out whether she desired to appeal and then filed a prompt motion for appropriate relief.
Nevertheless, despite these concerns, D.B. has suffered no prejudiceother than delaybecause, as we shall now explain, Adoption Rule 60(d) has given her a remedy for counsel's lack of diligence and has protected her right to appeal from the trial court's ruling on the merits.

B. The Adoption Rules

On September 11, 1997, the Superior Court issued an order promulgating the new Superior Court Adoption Rules. Order, 125 DAILY WASH.L. RPTR. 1901 (September 29, 1997). The rules were to take effect on October 15, 1997, and were to "govern all proceedings thereafter commenced. . . ." Id. These new rules apply to all adoption proceedings in the Family Division of the Superior Court, to the exclusion of all other procedural rules not expressly incorporated by the adoption rules. Super. Ct. Adopt. R. 1.[7] Because the adoption petition in the case at bar was filed in February 1998, there can be no dispute that this case is subject to the adoption rules.
Two of those rules are relevant in the case at bar. First, Adoption Rule 52(b) requires notice to all parties that a petition for adoption has been granted or denied by the court. Rule 52(b) states in pertinent part:
The Clerk shall serve on all contesting parties notice that the petition for adoption has been granted or denied, but not the final or interlocutory decree.
In addition, the adoption rules establish a procedure for challenging a final adoption decree in certain circumstances. Adoption Rule 60(d) states:
A motion seeking to invalidate a decree of adoption by reason of a jurisdictional or procedural defect shall be filed within one year following the date the final decree became effective.
These two rules govern the controversy here.
D.B. sought relief from the Final Decree of Adoption by filing a motion on September 7, 1999, within the one-year period allowed under Rule 60(d).[8] Her motion requested relief on the ground that she had received no notice of the docketing of the final adoption decree. While Rule 52(b) does not provide for notice of the adoption decree itself, it does require the clerk to serve notice of the granting of the petition for adoption "on all contesting parties." *476 In the order granting D.B.'s motion to set aside the adoption decree, the court found that, despite Rule 52(b), no notice of the granting of the adoption decree had been given to D.B.[9] For that reason the court granted D.B.'s motion to set aside the adoption decree, observing that because the motion had been made within one year of the docketing of the decree, it could be vacated "for good cause." A "Reissued Final Decree of Adoption" was filed the same day, from which D.B. noted a timely appeal.
W.E.T. and I.J.T. now argue that the lack of notice was not a "procedural defect," as that term is used in Rule 60(d) and in D.C.Code § 16-310 (2001), which contains essentially identical language.[10] They do not explain, however, why a failure to give the notice required by Rule 52(b) is not a procedural defect contemplated by the statute and the rule. Nor do they persuade us that such a lack of notice is insufficiently serious to merit relief under either Rule 60(d) or D.C.Code § 16-310. As a matter of common sense, and without any substantial argument to the contrary, we hold that a failure by the court, or its clerk, to give the notice required by Adoption Rule 52(b) is a basic procedural defect within the plain meaning of both the statute and Adoption Rule 60(d).
W.E.T. and I.J.T. also rely on Superior Court Civil Rule 60(b) in urging that we should read a showing of "excusable neglect" and a requirement of filing a motion "within a reasonable time" into Adoption Rule 60(d). Civil Rule 60(b), however, is a completely different rule from Adoption Rule 60(d). None of the language in the civil rule on which W.E.T. and I.J.T. rely appears in the adoption rule.[11] Further, Adoption Rule 1(b) expressly states that the adoption rules govern adoption proceedings to the exclusion of other Superior Court rules. W.E.T. and I.J.T. suggest that the commentary to the annotated adoption rules obliges us to incorporate the requirements of Civil Rule 60(b) into Adoption Rule 60(d). The commentary, however, forms no part of the rule and is generally without legal effect.[12] *477 We conclude that W.E.T. and I.J.T.'s arguments for reading the civil rule's requirements of "excusable neglect" and "reasonable time" into Adoption Rule 60(d) are without merit.
This court reviews decisions on motions seeking relief from a civil judgment under Civil Rule 60(b) for abuse of discretion. See, e.g., Fleming v. District of Columbia, 633 A.2d 846, 849 (D.C.1993); Schmittinger v. Schmittinger, 538 A.2d 1158, 1163 (D.C.1988); Joseph v. Parekh, 351 A.2d 204, 205 (D.C.1976). While we apparently have not yet reviewed a trial court ruling on a motion seeking relief from a final adoption decree under Adoption Rule 60(d), we note that the adoption rule serves the same function as its civil counterpart. Because this type of relief in a civil case rests within the discretion of the trial court, we conclude that our review in the context of an adoption case is identical; i.e., we review such rulings only for abuse of discretion. In this case, because D.B.'s motion to set aside the adoption decree was filed within one year from the entry of the decree on the docket, and because the court found that its own procedures for notifying D.B. of the entry of that decree had failed in this instance, the trial court's order vacating the decree fully complied with Adoption Rule 60(d). We therefore hold that the court did not abuse its discretion by granting the motion.
We turn, accordingly, to the merits of D.B.'s appeal.

III
In its order waiving D.B.'s consent to the adoption, the trial court stated that it found, by clear and convincing evidence, that such a waiver was in the best interests of the child. D.B. contends that there was insufficient proof to enable the court to make such a finding by clear and convincing evidence. We disagree.
The trial court, relying on D.C.Code § 16-304(e),[13] waived D.B.'s consent to the adoption after finding that her consent was being withheld contrary to the best interests of K.D.B. The court found that D.B. was a long-term drug abuser; that, at the time of the hearing, she was incarcerated and serving a sentence of two years and six months; and that she had failed to complete a drug abuse rehabilitation program. The court acknowledged that D.B. had expressed optimism about an early release, but it was not convinced that her optimism was justified, given her past criminal activity. In addition, the court suspected that D.B.'s drug addiction might still be a problem because her speech was slurred during a recent telephone conversation with I.J.T. The court noted that D.B. had also stopped visiting K.D.B. in June 1996 despite a visitation order enabling her to do so. All of these findings were amply supported by the evidence.
The court further found that K.D.B. had been living with W.E.T. and I.J.T., the adoption petitioners, from January 1994 to the present (i.e., to the time of the hearing in August 1998). While in their care during those four and a half years, K.D.B. had grown into a normal, healthy young boy after overcoming early asthma and weight problems. K.D.B. now addresses W.E.T. and I.J.T. as "Daddy" and "Mommy." He *478 also participates in normal family activities with W.E.T. and I.J.T. including reading, gardening, and participating in the church choir. Finally, the court found that W.E.T. and I.J.T. had detailed future plans for K.D.B., which included a college education. Once again, there was abundant support for these findings in the evidence.
Taking into account all of these facts, the trial court found that it was in the best interests of K.D.B. to grant the adoption petition over the mother's objection. Such a finding must be supported by clear and convincing evidence, but if it is, it can be overturned only on a showing of abuse of discretion. See, e.g., In re Baby Boy Co., 630 A.2d 670, 683 (D.C.1993), cert. denied, 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994); In re L.W., 613 A.2d 350, 359 (D.C.1992); In re D.R.M., 570 A.2d 796, 803-804 (D.C.1990). On the record before us, we can find no such abuse. We have said that, in a case such as this, we "must be satisfied that there is sufficient evidence `such that the possibility of an erroneous judgment does not lie in equipoise between the two sides.'" In re A.C., 597 A.2d 920, 926 (D.C.1991) (citation omitted). There is no way in which K.D.B.'s best interests can be said to be in equipoise; the trial court said in its conclusions of law that the issue was "not even close," and we agree.
The child's natural mother has not involved herself in his life to any extent, even failing to visit him when she could have done so for more than two years. Returning K.D.B. to D.B.'s care would involve numerous risks and uncertainties about D.B.'s ability to stay off drugs, her ability to maintain a home, and her status as a convicted felon serving a prison sentence or, perhaps, a parolee.[14] Reversing the trial court's decision would create a "wait and see" situation for K.D.B. of the sort which we have refused to allow in comparable cases in the past. See In re L.L., 653 A.2d 873, 887-888 (D.C.1995); In re M.M.M., 485 A.2d 180, 186 (D.C.1984).
On the other hand, the adoption promises K.D.B. a future within a loving and supportive family with whom he has now lived for more than eight years, including the potential for a college education. "[I]t would be `ruthless beyond description' to take a child out of a loving home, when [he has] lived at that home for a substantial period of time as a result of [his] biological parent['s] inability or unwillingness to care for [him]." In re L.L., 653 A.2d at 883 (citation omitted). Further, we have previously held that "a stable and desired environment of long standing should not be lightly set aside." Rutledge v. Harris, 263 A.2d 256, 257-258 (D.C.1970), quoted in In re L.L., 653 A.2d at 883.
We hold that the trial court's finding that waiving D.B.'s consent to the adoption was in the best interests of the child is supported by clear and convincing evidence.[15] We therefore find no abuse of discretion in that decision.

IV
For the foregoing reasons, the trial court's order granting the motion to vacate *479 the original 1998 Final Decree of Adoption and to reissue that decree in September 1999, and its order waiving D.B.'s consent to the adoption pursuant to D.C.Code § 16-304(e), are both
Affirmed.
NOTES
[1] Previously, in the summer of 1992, I.J.T. had taken care of K.D.B. for "about a week" while his mother was incarcerated for reasons undisclosed by the record. After she was released, I.J.T. returned K.D.B. to his mother.
[2] I.J.T. and W.E.T. are also caring for K.B., another child of D.B. who is three years younger than K.D.B. According to I.J.T., the two boys "are best friends, they love each other, they play together, they fight together . . . they have a normal brother relationship." The status of K.B. is not at issue in this case.
[3] K.D.B.'s father had previously filed a written consent to the adoption.
[4] The Final Decree consists of two pages. At the bottom of the second page appears the notation "Copies to:", followed by the name and address of counsel for the adoptive parents, but no one else. At oral argument there was some suggestion that there may have been a third page containing additional names and addresses which somehow went astray. Given our holding in part II of this opinion, however, we need not try to determine whether there was in fact a third page.
[5] D.B. could not have appealed from the original order waiving her consent to the adoption because such an order is not appealable. "An order waiving a birth parent's consent to adoption is not a final order and may not be appealed until the adoption proceedings have been concluded." In re S.J., 772 A.2d 247, 248 (D.C.2001).
[6] Counsel suggested at oral argument that he was unable to contact his client during those months, but the record reflects that D.B. was incarcerated at the time.
[7] Adoption Rule 1 reads as follows:

(a) Scope of Adoption Rules. These rules govern adoption proceedings in the Family Division of the Superior Court.
(b) Applicability of other rules. Unless otherwise expressly provided by rule, no other Superior Court Rules apply to adoption proceedings.
[8] The first Final Decree of Adoption was entered on the docket on October 6, 1998.
[9] The court said in its order:

Notwithstanding noting in the docket entry on August 18, 1998, that the mother's counsel was to be notified of the docketing of the decree in order to protect the appeal rights of the mother, it appears that this notation was not sufficient to effectuate the desired notice....
[10] D.C.Code § 16-310 provides:

An attempt to invalidate a final decree of adoption by reason of a jurisdictional or procedural defect may not be received by any court of the District, unless regularly filed with the court within one year following the date the final decree became effective.
Appellants acknowledge, in a footnote in their brief, that Adoption Rule 60(d) "mimics the statute." As far as this case is concerned, we see no material difference between the statute and the rule.
[11] Super. Ct. Civ. R. 60(b) reads in part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for [reason number] (1) ... not more than one year after the judgment, order, or proceeding was entered or taken.
[Emphasis added.]
[12] Furthermore, we are unconvinced that the commentary supports the proposition that W.E.T. and I.J.T. urge upon us. As we interpret the commentators' references to D.C.Code § 16-310 and In re M.N.M., 605 A.2d 921 (D.C.), cert. denied, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992), they seek to clarify the meaning of the term "filed," as used in the rule, as it relates to the term "regularly filed" in section 16-310, not to import "excusable neglect" or "reasonable time" requirements into the adoption rule (which did not exist when M.N.M. was decided).
[13] D.C.Code § 16-304(e) states:

The court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child.
[14] Although there was some discussion below about the possibility of early release, the record does not clearly disclose when, or whether, D.B. may be eligible for parole.
[15] Clear and convincing evidence is evidence "which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. It does not mean clear and unequivocal." In re Estate of Soeder, 7 Ohio App.2d 271, 310, 220 N.E.2d 547, 574 (1966) (citation omitted), quoted with approval in District of Columbia v. Hudson, 404 A.2d 175, 179 n. 7 (D.C.1979) (en banc), opinion after remand, 449 A.2d 294 (D.C.1982) (en banc).